ARNOLD ANDERSON,                                    Case No. 1:18-cv-380

       Plaintiff,                                    Cole, J.
                                                   Bowman, M.J.

   v.

JEFF LAWLESS, et al.,

       Defendants.


## REPORT AND RECOMMENDATION

Plaintiff Arnold Anderson initiated this pro se lawsuit on December 5, 2017 in Columbus, Ohio. However, venue was transferred to the Cincinnati division under S.D. Ohio Local Rule 82.1(c) and 28 U.S.C. §1404.   For the reasons stated below, the undersigned recommends that the Defendants' motion for summary judgment be granted in part and denied in part, and that Plaintiff's motion to strike Defendants' motion, Plaintiff's motion for summary judgment, and Plaintiff's motion to compel further discovery be denied.

### I.     Background

During the brief time in which the case remained pending in the Eastern Division of this Court, the Court screened Plaintiff's claims under 28 U.S.C. § 1915A.  (Docs. 6, 8).  Some claims were dismissed, but the Court permitted an Eighth Amendment claim and a First Amendment retaliation claim to proceed against three Defendants in their individual capacities.   Both claims arose on December 6-7, 2016, during a short period of time in which Plaintiff was temporarily held in the custody of the Lawrence County, Ohio, Sheriff's Department at the Lawrence County Jail ("the jail").

Plaintiff's Eighth Amendment claim is based upon his allegation that on December 6, 2016, he was using the telephone when he and Officer Hatfield became embroiled in a verbal dispute. Plaintiff generally alleges that in sequential incidents that took place between December 6 and December 7, Defendants Hatfield, Spoljarik, and Akers used excessive force against him. (*See generally* Doc. 6 at 2-6, citing complaint at 9-13). The First Amendment claim is based upon Plaintiff's allegations that the last use of force by Defendant Spoljarik was in retaliation for Plaintiff's attempted use of the jail's grievance system. (Doc. 6 at 9, citing complaint at 11).

## II.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986). The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548 (1986). Once the moving party has met its burden of production, the nonmoving party cannot rest on the pleadings, but must present significant probative evidence in support of his case to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 248-49. The mere scintilla of evidence to support the nonmoving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the

nonmoving party. *Id.* at 252. As Plaintiff is a pro se litigant, his filings are liberally construed. *Spotts v. United States*, 429 F.3d 248, 250 (6th Cir. 2005). However, his status as a pro se litigant does not alter his burden of supporting his factual assertions with admissible evidence when faced with a summary judgment motion. *Maston v. Montgomery Cnty. Jail Med. Staff Personnel*, 832 F. Supp. 2d 846, 851-52 (S.D. Ohio 2011) (citing *Viergutz v. Lucent Techs., Inc.*, 375 Fed. Appx. 482, 485 (6th Cir. 2010)).

### III.    Findings of Fact

The parties' versions of the relevant facts often differ in the record presented. In accordance with the above standard, where the evidence is disputed, all reasonable inferences have been drawn in favor of the Plaintiff.

The incidents at issue occurred at the jail on December 6 and 7, 2016, at a time when it appears that Plaintiff had been convicted and sentenced and was no longer a pretrial detainee.[1] As relevant background, both parties cite to a separate incident that occurred a week earlier at the jail. During a separate brief incarceration in November 2016, Plaintiff became ill with pancreatitis and was admitted to a local hospital. Upon his return to the jail on or about November 29, 2016, Plaintiff was involved in a fight with another inmate, Clayton Hill, in which Hill bit Plaintiff's ear. Plaintiff testified[2] that Hill

---

[1]Plaintiff's post-conviction status on the dates in question is highly relevant to his claims and the standards applicable thereto. An excessive force claim against a free citizen arises under the Fourth Amendment, whereas the Eighth Amendment governs excessive force claims filed by convicted persons. The Fourteenth Amendment's more generally applicable Due Process Clause governs excessive force claims filed by pretrial detainees. *See Hopper v. Phil Plummer*, 887 F.3d 744, 751 (6th Cir. 2018).

[2]Plaintiff seeks to strike Defendants' motion for summary judgment and objects to the use of his deposition testimony on grounds that he did not have the ability to review that testimony and did not sign the transcript. Defendants have filed records that reflect that the court reporter attempted to contact Plaintiff but did not receive a response. (Doc. 65 at 7-9). Although it is undisputed that Plaintiff is indigent and did not receive at least one of the court reporter's letters, the undersigned finds no basis to exclude the deposition transcript from consideration.

attacked him after Defendant Spoljaric yelled out that Plaintiff was an informant who obtained drugs from Hill. (Plaintiff Dep., Doc. 47-1 at 66).[3] Defendants maintain that Plaintiff instigated the fight. (Doc. 48-9 at 4-5, incident report). Although an unknown officer completed an Ohio Uniform Incident Report indicating his intent to charge Plaintiff with violations of Ohio's criminal code for assault and disorderly conduct, it is unclear whether that report was filed with any prosecutor.[4] Plaintiff was never formally charged with any offense.

Defendants cite to the November incident as evidence of Plaintiff's propensity to fight, although Plaintiff testified he has never been in any other fight with an inmate before or since. For his part, Plaintiff points to the incident as marking the escalation of conflict with Defendants, including the improper use of the jail's restraint chair when Spoljaric allegedly "dropped" the chair intentionally, in the same manner as allegedly occurred in the incidents at issue in this lawsuit. (Dep., Doc. 47-1 at 59). Plaintiff obtained a jail grievance form in November but did not explain his grievance other than writing that Defendant Spoljaric "scared me when he smiled." (*Id.* at 57). Plaintiff left the incomplete form in his cell on December 2, 2016 when he was transferred from the jail to the Correction Reception Center ("CRC") to serve out his sentence on drug-related offenses.

---

[3]Plaintiff filed a supporting affidavit of Inmate Hill on 12/31/18, which Defendants moved to strike on procedural grounds. The undersigned partially granted Defendants' motion insofar as the affidavit was a prematurely filed evidentiary exhibit, which could not be considered in the absence of relevance to any pending motion. (Doc. 42, citing Doc. 31).

[4]Defendants erroneously state in their motion for summary judgment that as a result of the incident, "Plaintiff was charged with two counts of assault on a peace officer, two counts of harassment, disorderly conduct and resisting arrest causing injury to officers." (Doc 48 at 24). In Defendants' reply, counsel acknowledges the misstatement and does not dispute Plaintiff's position that no formal charges were ever filed. Counsel explains: "These reports *can* be filed with the Prosecutor, but the report merely indicates the *potential* charges that can ultimately be filed." (Doc. 65 at 1, emphasis added).

The basis for this lawsuit arose four days later, on December 6, 2016, when Plaintiff returned to the jail from CRC in order to attend a state court hearing on December 7. At that hearing, the state court denied Plaintiff's motion for the appointment of counsel on appeal and corrected an error in Plaintiff's record regarding the severity of the offenses on which he had been convicted.[5] (Doc. 48-8). Plaintiff returned to CRC on December 7, 2016 to continue serving his sentence. (Doc. 47-1 at 21, 64).

When Plaintiff arrived at the jail, he had only a pre-existing abrasion on his ear from the November 29 fight. (*Id.* at 64). Less than 24 hours later, he had numerous injuries that - while mostly superficial - included swelling, cuts and bruises as well as a broken finger. The primary dispute in this case is whether the injuries were caused by the Defendants' reasonable use of force, or by excessive and/or retaliatory force. The record reflects a total of three incidents in which some force was used: (1) around 7 p.m. on December 6, 2016 when two Defendants entered Plaintiff's cell and became involved in a physical altercation; (2) immediately after that altercation when Plaintiff was placed in the jail's restraint chair by all three Defendants for the first time; and (3) in the early morning hours of December 7, in an incident between Plaintiff and Defendant Spoljaric that led to Plaintiff being placed in the restraint chair for a second time.

**The Altercation Between Plaintiff and Defendants Hatfield and Spoljaric**

During the early evening of December 6, Plaintiff was sitting on a cooler in the "isolation" cell talking on the phone to his girlfriend when Defendant Hatfield walked by.

---

[5]Plaintiff was convicted after trial of one or more fourth degree drug offenses, but that his record erroneously reflected third degree offenses. (Doc. 47-1, Anderson Dep. at 18-19; Doc. 48-8). Contrary to Plaintiff's testimony in this case, the state court transcript does not comport with Plaintiff's account that he alerted the state court judge that he had been beaten by jail deputies. (*Id.*)

Plaintiff interrupted his phone conversation to verbally engage Hatfield in what quickly became an argument about the charges on which Plaintiff was being held. Plaintiff stated that he would alert a local news station based upon his belief that the jail had no authority to hold him. Plaintiff also tried to order a soda from Hatfield, and reacted angrily when Hatfield said Plaintiff had no money by asking why his money "keep[s] disappearing off my books." (Doc. 47-1 at 23). The conversation grew more heated, and Plaintiff returned to his telephone conversation and asked, "are you recording this?"

> I said Hatfield, here's the deal, you can't tell me, and I was a smartass about this because I knew Hatfield had an assault in Federal Court in a lawsuit that they had just lost. That pissed Hatfield off from what I'm assuming. Hatfield hollers at Spoljaric and Akers.

(*Id.*)[6] According to Plaintiff, Officers Hatfield and Spoljaric subsequently entered his cell and proceeded to yank him off the cooler and beat him.

Defendants maintain that Plaintiff was "yelling" and "banging the phone on the receiver in the cell" and "causing commotion," which noise elicited an instruction "to quit causing a disturbance." (Spoljaric Affidavit, Doc. 48-4 at 1). "Anderson refused to calm down and continued yelling and hitting the phone on the receiver." (Hatfield Affidavit, Doc. 48-2 at 1; *see also* Akers Affidavit, Doc. 48-3; Doc. 48-6 at 3). Plaintiff denies causing any disturbance and denies being non-compliant with any orders. (Doc. 47-1 at 31). A December 6 incident report by Hatfield bearing the time of 1913 omits the reference to

---

[6]Plaintiff refers to a prior case in which Defendant Hatfield and two other Defendants were criminally charged with civil rights violations, Case No. 1:14-cr-120-TSB based upon an August 16-17, 2014 incident in which the Defendants were alleged to have used excessive force against an inmate identified as "L.K." Plaintiff includes a copy of the indictment as an exhibit in this case. (*See* Doc. 44-1). Hatfield and his co-defendants were acquitted of all criminal charges in Case No. 1:14-cr-120 following a jury trial in October 2015. A closely related civil rights case presumably filed by the same inmate, Larry Kinstler, was resolved through settlement and dismissed in March 2016. *See* Case No. 1:15-cv-139.

Plaintiff refusing a directive to "calm down" but does report that Plaintiff "was becoming more agitated and had been screaming and yelling since he had been booked back into jail today stating he cannot be held and we do not have a charge to hold him. He then said tell it to WSAZ their [sic] going to call you." (Doc. 54-1 at 17). The incident report states that "due to Anderson's behavior and starting to get the cell riled up and agitated, officers were going to move him to the tank for observation." (*Id.*) Hatfield states that the officers' intent was to prevent Plaintiff from "engag[ing in] fighting any of the inmates putting their safety at risk due to Anderson's irate behavior…" (*Id.*)

Defendants Spoljaric and Hatfield entered Plaintiff's cell, an area that is not monitored by video camera, while he was still on the phone. (Doc. 47-1 at 38). Plaintiff testified that Hatfield and Spoljaric immediately began to assault him, with Hatfield yanking him up off the cooler and both Defendants taking him down to the ground and punching him repeatedly. However, Defendant Hatfield attests that only after Plaintiff refused to stand and exit did he grab Plaintiff's arm in an "attempt[] to escort him out of the cell," whereupon Plaintiff pulled away and "tackled" Spoljaric, falling on top of him and punching him. (Hatfield Affidavit, Doc. 48-2; *see also* Doc. 54-1 at 17, incident report stating that Defendants "advised" Plaintiff "to stand up and put down the phone, Anderson refused then tensed up and lowered his head," causing Hatfield to "physically grab him by his left arm."). Hatfield states that only after Plaintiff pulled away and tackled Spoljaric did Hatfield punch Plaintiff three times in order to regain control and to protect Spoljaric.

Defendant Akers entered soon after, by which point Hatfield had regained a hold of Plaintiff's left arm. With Akers securing Plaintiff's right arm, the altercation ended. Plaintiff was handcuffed and the officers began to escort him out of the cell. Defendants

allege that Plaintiff shoved Spoljaric as they started walking. However, Plaintiff states that he merely "bumped" into a piece of metal near a threshold and that in response, "Spoljaric took my hands behind me, pulled them up, pulled me back on top of him," causing both to fall. (Doc. 47-1 at 36). Plaintiff does not claim injury from his brief fall in the hallway.

Hatfield's incident report refers to Plaintiff's "scratch injuries" including "on his left outer forearm" and forehead, as well as injury to "a pre-existing scratch on his right ear from…11-29-16." (Doc. 48-10 at 2). Hatfield states that Plaintiff permitted his left arm to be cleaned "after photos were taken but refused to let officers clean his forehead." (*Id.*) The report states: "Anderson did cause officers to get his blood on ourselves due to him resisting and fighting with officers also causing Deputy [S]poljaric to receive injury to his right knee causing swelling and pain." (*Id.*)

**The December 6, 2016 use of the Restraint Chair**

After the physical altercation, Defendants placed Plaintiff in a restraint chair that Plaintiff testified was also positioned out of view of video cameras. Plaintiff accuses Spoljaric of excessive force during and after he was placed in the restraint chair.

> Spoljaric walks to the back of the restraint chair, leans the restraint chair back and drops it to the floor approximately about 12 inches. I'm 240 pounds at the time. Then he walks around to my feet and places pink shackles on my legs. He takes his hand to my left leg and pushed it inwards and as he shoving down he was clicking the chain – the locking mechanism on the shackle – leg shackle.

(Doc. 47-1 at 39). Plaintiff claims that he screamed so loudly to other inmates asking them to call the Ohio State Patrol that "Hatfield or someone in that booking area" shut off the phones to the jail. (*Id.* at 40). Plaintiff alleges that he remained upside down in the chair while Spoljaric tightened the leg shackle for some period of time, all the while "acting

as if he's broke his key or his key was stuck in the shackle and that's why it's still at my feet and I'm upside down in that chair." (*Id.* at 41). Defendants subsequently righted the chair back toward the camera. (*Id.* at 42).

In support of his account, Plaintiff has filed as exhibits the April 10, 2019 Affidavit of Major William Winters and a letter written by an unidentified female inmate. Winters was the Jail Administrator from August 2016 until March 2019. (Doc. 69-5). Winters acknowledges receipt of the two-page undated letter from a "Jane Doe" witness.[7] The letter writer accuses Spoljaric of taking out his frustration on others whenever he is angry. The inmate complains that Spoljaric took out the cable for a week as punishment for one female inmate "responding to her brother who was at the time restrained in the chair & was apparently [sic] from the screams & sounds of terror…." (*Id.*) The letter goes on:

> [Spoljaric] had him placed right up against the dressing room or actually inside the dressing room because when the male inmate (Ray Anderson) spoke/screamed it seemed as if he was right up against our B-1 cat-walk door. At that point inmate Roy Anderson had yelled out "Help!!", "Can anyone hear me!" He also stated very loudly with anguish that Officer [Spoljaric] had broke his ankle & we could hear [Spoljaric] repeatedly tigthing up his cuffs &/ shackles making them tighter & tighter & the inmate wasn't even resisting b/c he was already IN THE CHAIR! What this officer done to this inmate in my opinion was un-called for, cruel & inhumane. Being placed in the chair due to unrulyness or being combative upon booking or whatever is one thing. But to be placed in the chair, restrained, having absolutely no free movement of your body & then to have an officer of the law who you are suppost to trust & look up to for help take full advantage of an inmate full bodily restrained & take it up on his self (the officer) to decide to physically hit him in the head & face as well it just down right disgusting! And I think it's wrong just b/c we were concerned & scared

---

[7]Plaintiff asserts that the letter is missing the last page on which the inmate's signature would have appeared. Major Winters states that to "the best of his knowledge, belief, and recollection" more than two years later, the two pages "were all that I received." (Doc. 69-5 at 1). The undersigned previously denied Plaintiff's motion to compel the "missing" page despite acknowledging that "the letter appears to be incomplete." The order denied the motion to compel in part because the issue had only recently been raised by Plaintiff and based upon the Court's confidence in "the ability of both parties to resolve this minor issue extrajudicially." (Doc. 42 at 6).

for the fellow inmate right smack against our cell) that we in b-1 have to be punished for what officer [Spoljaric] wrongly chose to do.

(Doc. 69-12, spelling, grammar and punctuation original).

Plaintiff testified that he remained in the chair with his left leg twisted for three and a half to four hours prior to being released shortly before midnight on December 6. (Doc. 47-1 at 42, 45). However, a printed "Inmate Chair Check" report reflects that Plaintiff was placed in the chair at 1913 on December 6, 2016 and was released approximately 2 hours later, at 2109. (Doc. 69-4).

During Plaintiff's first restraint, Defendants moved the chair to the holding tank. (Doc. 47-1 at 44). Spoljaric and Hatfield sprayed a solution on Plaintiff's bleeding (reinjured) right ear and on other injuries before taking pictures. (Doc. 47-1 at 51). Hatfield's incident report explains that he and Spoljaric cleaned a "left arm scratch after photos were taken" but that Plaintiff "refused to let officers clean his forehead." (Doc. 48-10 at 2).

Plaintiff testified that during his first confinement in the restraint chair, he could hear Hatfield and Spoljaric "taunting" him and threatening "to charge me with assault on police officers, harassment by inmate, escape, all kinds of stuff," including "resisting arrest." (Doc. 47-1 at 46). Hatfield's incident report of 12/6/16 indicates that Plaintiff "is being charged with" four criminal offenses. (Doc. 48-10 at 2). Hatfield also completed an Ohio Uniform Incident Report that asserted that Plaintiff had committed the following criminal offenses: (1) Assault on a Peace Officer; (2) Harassment by Inmate; (3) Disorderly Conduct; (4) Resisting Arrest – Causes Physical Harm to Law Enforcement Officer By Means of Deadly Weapon. (Doc. 54-1). Notwithstanding those reports, no

10

charges were ever pursued and Plaintiff was never prosecuted.[8]  Both Hatfield and Akers went off duty prior to Plaintiff's release from the restraint chair by non-party officers on December 6, 2016, but Defendant Spoljaric remained on duty.

Some evidence suggests that Plaintiff may have verbally complained to Winters, the Jail Administrator, about the force used against him, although the timing of that complaint remains unclear. Defendants have attached to their motion as an exhibit a "Grievance Response" form from Winters that reflects a "Grievance Date" of 12/06/16 and Grievance "Time" of 1945.[9]  In that form, Winters states that he has reviewed "the camera system in front of [the] tank and locker room area" and that he "had another supervisor view the film," but saw "no evidence to where inmate Arnold Anderson was assaulted or mistreated or bleeding as they [sic] have stated.  I did observe he was left in a position for a little too long and that will be addressed to officer Spoljaric.  The complaint was verbal."  (Doc. 48-16 at 1).[10]  Given Winters' denial of any evidence of an assault or bleeding, it is unclear whether Winters reviewed Hatfield's Incident Report, which referenced Plaintiff causing "officers to get his blood on ourselves" during the incident. (Doc. 48-10 at 2).

---

[8]As with the state Incident Report dated 11/29/16, there is no indication whether formal "charges" actually were filed with a prosecutor's office. As Plaintiff points out, Hatfield's statement in the incident report that charges were "also" filed against Anderson on 11-29-16 was incorrect

[9]The referenced time and date are somewhat confusing, insofar as Defendants deny that Plaintiff filed any grievance on December 6, and log books reflect he did not request a grievance form until just before midnight on December 6, hours later than the time reflected in Winters' "Grievance Response." The additional date of "11/16/16" is listed under the title "Jail Administrator." (Doc. 48-16).

[10]In addition to Winters' "Grievance Response," Defendants have offered an unsworn but signed statement from "Corporal Robert Bowles," dated March 6, 2017, that states that Bowles walked into an office on an unknown date "believe[d]" to be sometime "in December of 2016" and recalls seeing Winters "reviewing some recordings from the Jail cameras."  Bowles states that during "the short time that I was in the office, I didn't see anything," but admits that he "didn't watch the entirety of the video."  (Doc. 48-17).

**Second Use of Restraint Chair on December 7, 2016**

Plaintiff testified that he remained free from restraint for only 30-60 minutes before being placed in the restraint chair a second time by Spoljaric just after midnight in the early morning hours of December 7. (Doc. 47-1 at 45).

After he was freed, Plaintiff knocked on the cell door to request Tylenol, but testified that Spoljaric said "no, quit kicking the door" and shut the door abruptly so that the door struck Plaintiff's head. (Doc. 47-1 at 47). Plaintiff next requested a sick call and grievance forms, which Spoljaric also denied. (*Id.* at 55, 59-60). Soon after, Spoljaric appeared with a tazer along with Ironton Police Officer Jamie Pruitt. Plaintiff submitted to removal from the holding tank and placement in the restraint chair a second time. (*Id.* at 47). Once again, Spoljaric leaned the chair back, ostensibly to place leg shackles on Plaintiff, and let it drop, causing further pain to Plaintiff's head and neck. (*Id.* at 47-49). Spoljaric then righted the chair and placed Plaintiff in the chair back in the holding tank. (*Id.* at 50).

In a December 7 incident report, Spoljaric explained the events as follows:

> …I was walking past the TA when [Plaintiff] began knocking on the TA door. At that time he politely asked me for a Tylenol. At that time I went to the med room and opened the TA door…to give [Plaintiff] a Tylenol. At that time [Plaintiff] began cussing me and demanding I do something about his arm (that he was using fine and had no apparent major injuries.) I advised [Plaintiff to take the meds or I would shut the door and he would not get any. [Plaintiff continued to cuss and be rude. A[t] that time I attempted to shut the door…and [Plaintiff] threw himself against the door and screamed "Spoljaric what are you doing ouch quit." [Plaintiff] then began hitting the TA door with enough force to harm himself. To prevent injury to officers and inmate a Taser was brought into the jail and [Plaintiff] was ordered to the ground and cuffed behind his back without further incident.

(Doc. 48-12).

Plaintiff testified that he was left in the chair on December 7 for nearly six hours without monitoring or any opportunity for circulation to be checked. (*Id.* at 54). At the bottom of Spoljaric's incident report is handwritten notation stating that the "Chair Check will not Print went in @ 0039 out @ 0200." (*Id.*) Although there is no typed Chair Check report, a handwritten log indicates that Plaintiff was placed in the chair at 0039 and was released approximately an hour and a half later at 0203, when he was given a sick call form based upon his complaint of pain in his left arm. (Doc. 48-6 at 4).

Plaintiff testified that his left arm was so badly swollen from the restraint straps by the time he was released that a paramedic who works at the jail, Deputy Ray Jones, ordered an x-ray on Plaintiff's arm when he arrived at work that morning. (Doc. 47-1 at 53). Plaintiff completed a sick call request complaining of an "abnormality to my left arm, lesions on my head, right ring finger is bruised and swollen, knots on my chin. Cut on back of left arm." (*Id.* at 69-6, Doc. 47-2 at 10, ex. 4). However, he was transported back to CRC by Hatfield prior to any x-rays being taken at the jail. (Doc. 69-6 at 1).

Plaintiff has submitted several records that confirm that he sought medical care immediately upon his return to CRC. In an "Incident Report" authored by Lt. Erik Baratle dated 12/7/16 at 1:10 p.m., for example, Lt. Baratle reports that Plaintiff "stated he was beat up by deputies at the county," and "has marks on his ear, arms and forehead." (Doc. 69-7 at 2). Plaintiff also reported that he thought his jaw might be broken. Lt. Baratle states he "had the inmate write a voluntary statement," and "had pictures taken of his visible injuries and had the inmate get a medical evaluation." (*Id.*) The report concludes with a handwritten statement that the incident was "reported to Investigator Thompson [illegible]..It was a documented UOF at County." Plaintiff's handwritten statement reads

13

in part:

> I was on a …phone call talking to my fiancé and son.  C/O Deputy Hatfield came to panhole asking for razors from where I was sitting on a cooler & on the phone.  I had to look up, I ask if I could get some information on when I'm going to court; and if I could buy soda; Hatfield told me to hand phone up.  I asked why.  He yelled for C/O Deputy Spoljari[c].  He arrived with Joey Akers at door.  Hatfield came from left.  Spoljari[c] hung phone up.  Hatfield slammed me to the floor.  Spoljari[c] commenced punching me repeatedly yelling give me your hands.  [Illegible] stepped on my left hand.  Cell was full.  After taken to chair.  I was shackled with left leg twisted to right shackled till couldn't go anymore repeatedly squeezing [illegible] left arm strapped dropped in chair placed in holding tank strapped; then back to chair after released.

(Doc. 69-7 at 3).

Medical records from CRC similarly reflect Plaintiff's report of "trauma to the head, [left] arm and [left] chest when he was allegedly beaten by 2 county officers after he made some type of remark.  Has pain and swelling of lt arm and pain and swelling lt lower leg area.  He reports lacerations of the [left] forearm and forehead."  (Doc. 69-3 at 1; *see also* Doc. 69-6).  In examination notes, Dr. Cullen at CRC noted swelling in Plaintiff's leg with circular markings on the leg, dried blood, lacerations, and swelling in Plaintiff's left forearm, and a swollen right finger, as well as injuries of the face and neck.  (Doc. 69-3 at 2). A second Medical Exam Report also dated 12/7/16 restates Plaintiff's subjective report that he "was beaten up by two deputies from Lawrence County Jail." (Doc. 48-18).  That report includes objective findings of pain to Plaintiff's left rib, left leg, left shoulder, bruises on Plaintiff's forehead and left middle finger, knots on the back of his head, and a superficial laceration to his left lower arm about three inches long.  (*Id.*)  Plaintiff was treated with ibuprofen and triple antibiotic ointment bandages and x-rays were ordered.  (*Id.*)

14

The X-rays[11] confirmed no fracture to Plaintiff's left wrist but did reveal a fracture to the fourth finger in Plaintiff's right hand, which was treated with a splint. (Doc. 47-1 at 72; *see also* Doc. 69-3 at 3, 7 "X-ray showed Nondisplaced tuft fracture of right distal fourth digit. No swelling or redness. Tenderness only"). Plaintiff testified that over time, he has received medications for the nerve damage in his left arm and other medication related to the injuries he suffered on December 6-7, 2016. (*Id.* at 71, 87-89, 99). Other records reflect Plaintiff's report of mental health symptoms in the months following the alleged assault, including increased anxiety and fear of "going back to the jail due to what happened." (Doc. 69-3 at 10).

### The Lack of Photographic or Video Evidence

Notwithstanding Winters' December 6 "Grievance Response" indicating his review of some video, the jail did not preserve any video records from December 6 or 7, 2016. The jail suggests that it had no duty to do so,[12] but Plaintiff argues that the failure to retain video footage violated Ohio Corrections and Rehabilitation Department regulations. Those regulations require the retention for 10 years for any investigation files, including those "involving an employee or offender's alleged violation of policy, procedure, or Ohio Revised Code." (Doc. 54-1 at 3). Based upon a referral by CRC for "investigation," as well as the relatively serious criminal code violations reported by Hatfield, Plaintiff argues

---

[11]Defendants argue that "there is nothing in the record establishing that the Plaintiff ever had any x-rays" at CRC after leaving the jail. Despite the apparent absence of the x-rays themselves, the referenced records provide strong circumstantial evidence that x-rays were taken.

[12]Attached to Defendants' motion for summary judgment is an unsworn and unsigned "Memo" dated 03/06/17 bearing the typed name of Jail Administrator Winters. The memo states that Winters reviewed the video of Plaintiff "on 12/07/2017 and at that time there was no evidence to back up his statement that he was assaulted n\by [sic] officers. I tried to review this footage again to copy for you but our system only goes back for 30 days so this film is no longer able to recover." (Doc. 47-2, Ex. 2). The latter reference to "2017" is presumed to be a typographical error.

that video evidence should have been retained. (*See, e.g.,* Doc. 69-7 at 2, handwritten notation on CRC report stating that incident was "reported to Investigator Thompson" as "a documented UOF in County"). The undersigned expresses no opinion on this evidentiary issue, finding it to be beyond the scope of this R&R.

In addition to the lack of video evidence, no photographic evidence exists despite multiple photos having been taken. (*See* Doc. 69-4, 12/6/16 Inmate Chair Check report that Defendants Hatfield and Spoljaric took "more photos" at 2037, implying the existence of earlier photos; *see also id.*, noting an additional photo was taken of "a mark on left leg"; Doc. 48-6 at 3, stating that Hatfield and Spoljaric went "to get more Photos of Anderson"; Doc. 48-10 at 2, noting "photos were taken"; Doc. 69-7 at 2, Incident Report by Officer Erik Baratle at CRC dated 12/7/16 at 1:10 pm., stating Plaintiff's report that he was "beat up by deputies at the county," and "has marks on his ear, arms and forehead" and "thinks his jaw may be broken," and directing photos to be "taken of his visible injuries").

Winters' 2019 Affidavit attempts to explain the lack of photographic evidence. Winters states that he never saw any photographs taken on December 6, 2016, and that jail records do not contain photos from that date. (Doc. 69-5). He further states his "belie[f]" that photographs from that date "were not downloaded from the camera's SD card onto the external hard drive due to the SD card malfunctioning," based on his "recollection" that sometime "*around* December of 2016, the SD cards used in the camera were malfunctioning and the pictures on the SD card were corrupt." (*Id.*, emphasis added). Aside from the general reference to the month of December, the Affidavit does not otherwise refer specifically to photos that may have been taken on December 7, 2016.

## IV. Defendants' Motion for Summary Judgment

### A. Exhaustion of Administrative Remedies

The undersigned begins by addressing the procedural argument that the Defendants are entitled to judgment based upon Plaintiff's failure to exhaust his administrative remedies. Pursuant to the PLRA, prisoners are required to fully exhaust available institutional remedies prior to filing suit in federal court. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). The Supreme Court has held that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

It is well established that such exhaustion is "mandatory under the PLRA and unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 201, 211 (2007). The PLRA requires "proper exhaustion of administrative remedies," meaning all applicable procedures and deadlines must be followed. *Woodford v. Ngo*, 548 U.S. 81, 84, 90-91 (2002). The exhaustion requirement's goals can be achieved "only if the prison grievance system is given a fair opportunity to consider the grievance." *Id.* at 82. "That cannot happen unless the grievant complies with the system's critical procedural rules." *Id.* If a prisoner fails to exhaust available administrative remedies before filing a complaint in federal court, or only partially exhausts them, then dismissal of the complaint is appropriate. *Hopkins v. Ohio Dep't of Corr.*, 84 Fed. Appx. 526, 527 (6th Cir. 2003) (citing

42 U.S.C. § 1997e(a) and *White v. McGinnis*, 131 F.3d 593, 595 (6th Cir. 1997)). "Exhaustion may not be completed after a federal complaint has been filed." *Hopkins*, 84 Fed. Appx. at 527 (citing *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999)). "In a claim by a prisoner, failure to exhaust administrative remedies under the PLRA is an affirmative defense that must be established by the defendants." *Napier v. Laurel Cnty.*, 636 F.3d 218, 225 (6th Cir. 2011) (citing *Jones*, 549 U.S. at 204); *see also* Does 8-10 v. Snyder, ___ F.3d ___, 2019 WL 68853227 (6th Cir. December 18, 2019) (holding that the defendants bear the burden of proof, reversing summary judgment based upon disputed issues of fact concerning plaintiffs' attempts to exhaust).

The Lawrence County Jail has a two-step inmate grievance policy (Policy # J-66-2) intended "to address problems or complaints of any nature in reference to … treatment during incarceration [at the Jail]." (Doc. 48-5). Defendants assert that a handbook containing the policy is provided to all inmates entering the jail, although Plaintiff denies such receipt.[13] Pursuant to the policy,[14] an inmate must request and submit an "Inmate Grievance Form." (*Id.*) If at the first step the complaint is not resolved by the Shift Supervisor, the inmate may appeal to the Jail Administrator for a final decision. (*Id.*) Plaintiff asserts that Defendant Spoljaric was the Shift Supervisor at the time; Defendants deny that assertion but do not identify who filled that role.

A jail log confirms that Plaintiff requested a grievance form near midnight on the

---

[13]Plaintiff filed a declaration that he has "never seen a Lawrence County Jail handbook or anything informing me of a grievance procedure." (Doc. 69-7). Plaintiff does not dispute that he was aware of the existence of grievance forms, having partially completed a form in November, and having requested a form from Spoljaric on December 6.

[14]The policy attached to Defendants' motion reflects a "Revised" date of October 3, **2018**. (Doc. 48-5 at 1).

night of December 6, 2016, at 11:53 p.m. (Doc. 48-6 at 4, Lawrence County Jails Log for 12/6/16, stating "Anderson asked for Grievance"). However, Defendant Spoljaric attests that he does not "recall" Plaintiff ever asking for a grievance form.[15] (Doc. 48-4). Plaintiff testified that Spoljaric denied his request for the form. (Plaintiff Dep., Doc. 47-1 at 59-64). In any event, the jail has no record of Plaintiff actually filing a written grievance on December 6 or December 7. In another contradiction, Plaintiff reports that he completed a grievance form and slid it out under the cell door along with the sick call form provided to him on December 7. (Doc. 69-7 at 1).

There is no dispute that Plaintiff filed a written complaint after he returned to CRC. In that complaint, Plaintiff alleged he was beaten by jail staff in retaliation for filing a grievance, and that he had filed grievances at the jail that went unanswered. (Doc. 69-7 at 4). In response, the Jail Inspector of the Ohio Department of Rehabilitation & Corrections undertook an investigation by contacting the jail. (Doc. 69-7 at 6). The Jail Inspector informed Plaintiff that the jail denied that he had been beaten in retaliation for filing a grievance:

> Major Winters disputes this allegation. He reported he can find nothing indicating you ever expressed a concern of being assaulted during your incarceration at the Lawrence County Jail. Major Winters investigated your alleged complaint once it was brought to his attention and was not able to find any evidence of an assault between the jail staff and yourself. Major Winters indicated he reviewed jail video and found no such assaults.

(Doc. 69-7 at 7). The ORDC response also explains that Major Winters also disputed a

---

[15]Defendants' memorandum in support of summary judgment erroneously asserts that "Spoljaric maintains that the Plaintiff never requested a sick call and/or grievance from him on December 6-7, 2016." (Doc. 48 at 15, emphasis added). However, Spoljaric's affidavit states only that he could not "recall" Plaintiff's request. Defendants argue that "even if Plaintiff was denied a grievance form, it does not excuse his failure to exhaust." (Doc. 48 at 15). But binding Sixth Circuit case law holds to the contrary. *See Does 8-10 v. Snyder*, *supra* at **8-11.

separate complaint that Plaintiff's grievances went unanswered. "Major Winters stated your grievance was personally addressed by him. He further claims he told you no violations had occurred." (*Id.*)

Somewhat curiously in light of other evidence submitted by Defendants that Winters denied Plaintiff's verbal grievance on 12/6, Winters' response to the investigative inquiry from CRC on January 3 implies that he previously was unaware of any complaint from Plaintiff. The response states that Winters reported "find[ing] nothing indicating you ever expressed a concern of being assaulted during your incarceration at the Lawrence County Jail." (Doc. 69-7 at 7). After the issue was brought to his attention [presumably by the State Jail Inspector], Winters reported that he reviewed "jail video" but "was not able to find any evidence of an assault between the jail staff and yourself." (*Id.*)

The Defendants are not entitled to summary judgment based upon Plaintiff's alleged failure to exhaust because they have not carried their burden "to establish the absence of a genuine dispute of material fact" on the issue. *Accord Does 8-10 v. Snyder*, 2019 WL 6885327 at *7. In *Snyder*, the court explained that the PLRA's "unavailability exception" applies in several circumstances, including but not limited to "when prison administrators thwart inmates from taking advantage of a grievance process…" *Id.* at *9, quoting *Ross v. Blake*, 136 S. Ct. 1850, 1860 (2016)). The "unavailability exception" to exhaustion also may apply when a grievance process is "incapable of use." *Id.* at *10.

Whether or not Plaintiff was prevented by Defendants from exhausting the only available jail grievance procedure remains in dispute. In addition, Plaintiff was held at the jail for less than 24 hours. (Doc. 69 at 9). Even if Defendants had provided Plaintiff with the grievance form near midnight on December 6, the Defendants have failed to establish

that Plaintiff had sufficient time to file the grievance, receive a written response from the Shift Supervisor, and then pursue a formal appeal in the few hours that remained prior to his return to CRC on December 7, 2016.[16]

### B. Excessive Force Claim Against Defendant Akers

Turning to the merits, Defendant Akers argues that he is entitled to summary judgment based upon Plaintiff's admissions that Akers was not personally involved in the alleged excessive use of force on December 6-7, 2016. The complaint alleges that Akers "entered the cell to assist and stamped on the plaintiff['s] right [hand]" which resulted in a fracture. (Complaint at ¶37). However, Plaintiff's deposition testimony clarifies that Defendant Akers lacked any subjective intent to harm Plaintiff.

Specifically, Plaintiff testified that Spoljaric and Hatfield entered his cell first. (Doc. 47-1 at 27). Hatfield grabbed Plaintiff's arm and yanked him off the water cooler on which he had been seated while using the phone, and both Hatfield and Spoljaric began assaulting him. Plaintiff was pinned by Hatfield and Spoljarik with his head on the floor and his hand near the cell entrance by the time that Akers entered the cell. (Doc. 47-1 at 27-28). Based on his head position, Plaintiff could not see who stepped on his hand. He testified that he felt excruciating pain when someone (presumed to be Akers) stepped on his hand. (*Id.* at 29). However, Plaintiff could not discern whether that contact was accidental, or whether that action caused the fracture to his finger versus some other portion of the use of force incident. (Doc. 47-1 at 28-29).

---

[16]Plaintiff alternatively argues that the steps he took to grieve the issues immediately upon his return to CRC were sufficient, but the undersigned finds no need to review this issue in light of Defendants' failure to carry their burden on the issue.

A…When Akers stepped into the cell, Hatfield was kneeing me or kicking me or something in the back. Spoljaric is kicking me over here on the left side. Akers is going -- I don't know if it's when I went down that fractured my hand right here or if it's when he stepped in and stepped on my hand.

Q  You're saying Hatfield stepped on your hand?

A Akers stepped through the door. I'm not sure. I can't say for positive that he stepped on my hand. I know there was excruciating pain through my right hand.

Q And it could have been when you fell?

A It could have been when I went down. Yes.

(Doc. 47-1 at 25, lines 13-23).[17]

Plaintiff reiterates in opposition to summary judgment that he "cannot say if defendant Akers intentionally stamped on plaintiff[']s hand…."  (Doc. 69 at 4).  In other testimony, Plaintiff clarifies that he does not hold Akers responsible for anything other than for failing to intervene when Defendants Hatfield and Spoljaric used force.  "Akers never – when this, the initial use of force took place <u>Akers was not involved</u>.  And I want for the record, <u>Akers did not do anything wrong other than failure to intervene</u>."  (Doc. 47-1 at 27, emphasis added).  Akers was not present in the cell when Hatfield and Spoljaric were assaulting him, and "did not witness this take down."  (*Id*. at 29).

Defendant Akers attests that he assisted Deputy Hatfield in securing Plaintiff's hands behind his back and placing him in handcuffs after Defendant Hatfield and Spoljaric skirmished with Plaintiff in the cell.  (Doc. 48-3).  In one discrepancy from Plaintiff's testimony, Defendant Akers attests that he was the deputy who tilted the restraint chair

---

[17]Plaintiff disagreed with counsel's characterization of a "fall", denying that he fell and testifying that he was "slammed and kicked and beat down" by Hatfield and Spoljarik.  (*Id*. at 28).

back in order to allow Defendant Spoljaric to apply ankle restraints.  (*Id.*)[18]  However, Akers denies dropping the chair, and there is no dispute that his shift ended prior to Plaintiff's release from the chair.  (*Id.*)

Defendant Akers is entitled to judgment as a matter of law based upon the lack of evidence that he had any personal involvement or responsibility for any excessive use of force by Defendants Hatfield and Spoljaric.   The parties agree that Akers was not present when Hatfield and Spoljaric entered Plaintiff's cell.  To the extent that Akers might have caused Plaintiff any injury by stepping on Plaintiff's hand, that occurred when Akers entered the cell to assist after being summoned by his fellow officers during a brief physical altercation. Subjective intent to harm is a central element of any Eighth Amendment claim.  Based upon the uncontested evidence and Plaintiff's own testimony, Defendant Akers had no subjective intent to harm Plaintiff on December 6, and his shift concluded before Plaintiff's release from the restraint chair on that date.

In opposition to summary judgment, Plaintiff argues that judgment should not be entered in favor of Akers based upon Akers' testimony that he leaned back the restraint chair.  But Plaintiff does not allege that "leaning back" the chair caused any harm.  So to the extent that a factfinder were to accept Akers' version of events, he did nothing that would have violated the Eighth Amendment.    Of course, Plaintiff testified that it was Spoljaric who leaned the chair back and intentionally dropped it 12 inches to the floor, resulting in pain and injury to Plaintiff's head and neck.  Thus, if Plaintiff's version of events

---

[18]Akers' affidavit differs from Defendants' Answer in which they "admit that…Spoljar[ic] did lean the chair back to allow for the restraint of the Plaintiffs feet." (Doc. 16 at ¶42).

is accepted, Akers still did nothing violative of the Eighth Amendment. Because Akers did nothing wrong in either version of events, he is entitled to summary judgment.

Plaintiff's additional assertions that Akers' conduct violated jail policies or procedures concerning the placement of the chair or Plaintiff's medical treatment does not preclude judgment in Akers' favor. Plaintiff's claim against Akers is limited to the excessive use of force; the complaint does not allege that Plaintiff advised Akers of any serious medical need.[19]

### C. Eighth Amendment Claims Against Spoljaric and Hatfield

Plaintiff's Eighth Amendment claims against Spoljaric and Hatfield are based upon his testimony that those two Defendants entered his cell and physically assaulted him without cause, and with a subjective intent to harm him, in reaction to Plaintiff's verbal "smart ass" remark to Hatfield. (Doc. 47-1 at 23). Plaintiff claims that both Hatfield and Spoljaric used excessive force and caused physical harm during the assault in the cell, and subsequently, when he was first placed in a restraint chair and Spoljaric "dropped" the chair and applied excessively tight restraints with a subjective intent to cause him pain.[20] Plaintiff further alleges that Spoljaric (but not Hatfield) violated the Eighth Amendment by restraining him a second time in the chair during the early morning hours of December 7, when Spoljaric again intentionally dropped the chair backwards, secured him with excessively tight restraints, and left him unattended for hours without checking on his condition.

---

[19]Plaintiff testified that he first asked Spoljaric for Tylenol and a sick call form after his release from the restraint chair hours later –by which time Akers' shift had concluded.
[20]Defendant Hatfield was present during the first restraint on December 6 but Plaintiff does not allege his involvement in the second restraint.

In *Williams v. Curtin*, 631 F.3d 380 (6th Cir. 2011), the Sixth Circuit summarized the subjective and objective elements required to prove an Eighth Amendment claim:

> Although prison discipline may require that inmates endure relatively greater physical contact, the Eighth Amendment is nonetheless violated if the "offending conduct reflects an unnecessary and wanton infliction of pain." *Pelfrey v. Chambers,* 43 F.3d 1034, 1037 (6th Cir.1995) (internal alterations and quotation marks omitted). To make out a claim under the Eighth Amendment, the prisoner must satisfy both an objective and a subjective component. *See, e.g., Moore v. Holbrook,* 2 F.3d 697, 700 (6th Cir.1993).
>
> The subjective component focuses on the state of mind of the prison officials. The relevant inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (internal quotation marks omitted). Courts may consider "the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of injury inflicted." *Whitley,* 475 U.S. at 321, 106 S.Ct. 1078. Courts may also consider the circumstances "as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." *Id.*
>
> The objective component requires the pain inflicted to be "sufficiently serious." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). This is a "contextual" inquiry that is "responsive to contemporary standards of decency." *Hudson,* 503 U.S. at 8–9, 112 S.Ct. 995 (internal citation and quotation marks omitted). The seriousness of the injuries are not dispositive; as the Supreme Court has held, "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated ... whether or not significant injury is evident." *Id.* at 9, 112 S.Ct. 995; *see also Wilkins v. Gaddy,* 559 U.S. 34, 130 S.Ct. 1175, 1178, 175 L.Ed.2d 995 (2010) (per curiam).

*Id.*, 631 F.3d at 383.

Defendants argue that there is insufficient evidence of any malevolent subjective intent, citing the affidavits of Hatfield and Spoljaric that the only force they used was "reasonably necessary" in order to secure a combative inmate who initiated a physical attack when they entered his cell in order to remove him for "observation" and in order to

quell his verbal "commotion." However, on summary judgment, the Court cannot merely consider the Defendants' affidavits and evidence; the Court also must consider any contrary evidence, including but not limited to Plaintiff's testimony. The record as a whole reveals significant disputed issues of material fact concerning Defendants' subjective intentions both when they first entered Plaintiff's cell on December 6, and when they later placed Plaintiff in the restraint chair. In short, the undersigned cannot grant judgment to Defendants Hatfield and Spoljaric because the record is unclear as to whether their actions were undertaken "maliciously and sadistically" and amounted to the "unnecessary and wanton infliction of pain." *See, e.g., Hammond v. Lapeer County*, 133 F. Supp. 899 (E.D. Mich. 2015) (concluding that issues of fact precluded summary judgment on claims by prisoner held on civil contempt that jail deputies applied force in violation of Eighth Amendment standards), abrogated in part by *Hopper v. Phil Plummer* when it established that Fourteenth Amendment standard, and not Eighth Amendment, should apply to civil contemnors.

Although the objective component presents a somewhat closer issue, Defendants also are not entitled to summary judgment on that element. Defendants argue that Plaintiff offers insufficient evidence of "sufficiently serious" injury. In support for that premise, Defendants cite a logbook entry that Plaintiff "refused medical treatment" while at the jail. (Doc. 71 at 9). However, Plaintiff testified that the Defendants falsely recorded that he refused medical treatment at the jail, and there are a number of records that suggest that Plaintiff did in fact request such treatment prior to his departure from the jail on December 7 as well as upon his arrival at CRC.

Medical records reflect lacerations, bruises, and swelling sufficiently serious for the medical examiners to order x-rays, even though x-rays confirmed the absence of any broken bones other than a finger in Plaintiff's right hand. Although Plaintiff's injuries appear to have been relatively minor, the undersigned cannot say that the injuries were so "de minimis" that no claim can lie, particularly in light of the unresolved issues concerning Defendants' subjective intentions.[21] The Supreme Court has rejected a higher threshold for injury, explaining that otherwise, "the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." *Hudson v. McMillian,* 503 U.S. at 9, 112 S.Ct. 995; *see also Wilkins v. Gaddy,* 130 S.Ct. at 1177 (reversing dismissal of Eighth Amendment claim where inmate alleged he was assaulted in retaliation for requesting a grievance form and emphasizing that judicial inquiry should focus on "the nature of the force rather than the extent of the injury.").

> Injury and force… are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.

Id., 130 S.Ct. at 1178-79.

The alleged use of excessively tight restraints presents similarly close issues. Although most cases of excessively tight restraints arise under the Fourth Amendment as opposed to the Eighth Amendment, Sixth Circuit precedent makes clear that evidence of swelling and bruising often is sufficient to overcome summary judgment on such claims:

---

[21]Plaintiff also testified to continuing nerve damage in his arm, for which he complains he has been unable to obtain an MRI and alleges a continuing exacerbation of mental health symptoms.

> Our precedent establishes that this evidence is sufficient for Baynes to survive summary judgment. *See Morrison,* 583 F.3d at 402–403 (holding that the plaintiff's testimony that she suffered wrist marks and bruising from the handcuffs was sufficient to establish the necessary "physical injury"); *Martin v. Heideman,* 106 F.3d 1308, 1310, 1312–13 (6th Cir.1997) (reversing the district court's award of qualified immunity, ruling that a genuine issue of material fact existed as to whether the defendant officer used excessive force under the circumstances where plaintiff complained of excessive force by being handcuffed so tightly that his hands became numb and swollen during the ride to jail and wait in a holding cell).

*Baynes v. Cleland*, 799 F.3d 600, 609 (6th Cir. 2015); *Morrison v. Board of Trustees of Green Tp.*, 583 F.3d 394, 403 (6th Cir. 2009) (collecting cases and holding that bruising can support excessive use of force claim based on handcuffing).  Based upon Plaintiff's testimony, the undersigned concludes that summary judgment cannot be granted on Plaintiff's Eighth Amendment claims against Hatfield and Spoljaric.

### D.  First Amendment Claim Against Akers and Hatfield

In his First Amendment retaliation claim, Plaintiff alleges that the Defendants retaliated against him asking for medication, a sick call form, and a grievance close to midnight on December 6.  Plaintiff testified that he made these requests to Defendant Spoljaric, and that it was Spoljaric who subsequently placed Plaintiff back in the restraint chair for 5-6 hours in retaliation for his requests.  There is no dispute that neither Akers nor Hatfield were present at the jail by the time Plaintiff was released from the restraint chair the first time.  (Doc. 47-1 at 45-47).  Unsurprisingly since they appear to have left the premises, Plaintiff does not allege that Hatfield or Akers took part in placing him in the restraint chair a second time on December 7.  Because neither of those Defendants played any role in the alleged First Amendment violation, both are entitled to summary judgment on this claim.

### E.  First Amendment Claim Against Spoljaric

By contrast, Defendant Spoljaric is not entitled to summary judgment on Plaintiff's First Amendment claim.  Defendants argue that this Court should grant judgment in Spoljaric's favor because Plaintiff's claims are "unsubstantiated" and based upon "contradictory stories" between the Complaint and Plaintiff's testimony.[22] (Doc. 48 at 17). However, in many cases discrepancies will arise after discovery between the complaint and the evidence presented on summary judgment or at trial.  Rule 56 requires a focus on the evidence; a complaint is not evidence.  The fact that the record as developed (including but not limited to Plaintiff's own testimony) differs slightly from the allegations in the complaint may provide grounds for cross-examination but does not provide grounds for granting summary judgment.

In addition to pointing out the inconsistencies between the complaint and Plaintiff's testimony, Defendants argue that Spoljaric should be granted summary judgment based upon his testimony that he does not "recall" Plaintiff asking him for a grievance from. Defendants assert that because there is no record of Plaintiff having turned in a written grievance, there is "no basis to establish" that Plaintiff ever asked Spoljaric for a grievance.  Defendants' arguments ignore Plaintiff's contrary deposition testimony, which creates a genuine issue of material fact that precludes summary judgment.

Defendant further argues that he should be granted summary judgment because there is no evidence that Plaintiff successfully filed a written grievance while still at the

---

[22]For example, the complaint alleges that Plaintiff requested a sick call and grievance form from Deputy Brandt.  (Complaint at ¶54).  However, in his deposition testimony, Plaintiff clarified that he recalled asking Defendant Spoljaric for the forms and that Spoljaric both denied his request and retaliated in anger.

jail. Defendant argues that "the First Amendment protects an individual from retaliation for filing, not merely requesting, a grievance form." (Doc. 48 at 18). Thus, Spoljaric argues that even if he retaliated against Plaintiff with physical violence after denying access to the jail's grievance form, he could not be held liable so long as Plaintiff did not somehow obtain a copy of the form from some other source and file it *prior to* the retaliatory violence.[23] Aside from the logical absurdity of that proposition, the relevant case law does not support it.[24]

> Nothing in the First Amendment itself suggests that the right to petition for redress of grievances only attaches when the petitioning takes a specific form." *Holzemer v. City of Memphis*, 621 F.3d 512, 521 (6th Cir. 2010) (finding that a conversation constituted protected petitioning activity) (quoting *Pearson*, 471 F.3d at 741). While we recognize concerns about opening the floodgates to frivolous prisoner lawsuits, "we are not persuaded that an oral grievance should not receive constitutional protection solely because it is lodged by a prisoner as opposed to a civilian." *Mack*, 839 F.3d at 298. A "prisoner[ ] retain[s] the constitutional right to petition the government for the redress of grievances."

*Maben v. Thelen*, 887 F.3d 252, 265 (6th Cir. 2018) (quoting *Turner v. Safley*, 482 U.S. 78, 84 (1987) (additional citation omitted)); *see also Kennedy v. Bonevelle*, 413 Fed. Appx. 836, 839-840 (6th Cir. March 3, 2011).


### F. Qualified Immunity

---

[23]Defendants argue that the only evidence of any grievance was Plaintiff's verbal complaint to the Jail Administrator after the incident occurred. Plaintiff testified that he made a verbal grievance to "Billy Winters and Robert Bowles" on December 7, just before he was taken to state court. (Doc. 47-1 at 60-61). As stated *infra*, Winters' "Grievance Response" attached as an exhibit to Defendants' motion is dated December 6, coinciding with the date (but not the time) of the first incident and prior to Plaintiff being placed in the restraint chair a second time. (Doc. 48-16).

[24]Defendant cites to case law that is based upon different "due process" claims filed by prisoners, rather than the type of First Amendment retaliation claim at issue here.

Defendants argue that they are entitled to qualified immunity because "no constitutional violation occurred." For the reasons stated, the undersigned concludes that significant issues of material fact preclude granting summary judgment on Plaintiff's Eighth Amendment claims against Defendants Hatfield and Spoljaric and on Plaintiff's First Amendment claim against Spoljaric. For the same reasons, summary judgment cannot be granted on qualified immunity on those claims.[25]

### G. Injunctive and Declaratory Relief

Defendants argue that they are also entitled to judgment on all claims for injunctive and declaratory relief, because Plaintiff was only briefly incarcerated at the county jail and remains in the custody of the state. The undersigned agrees that Plaintiff's request for injunctive and declaratory relief appears to be moot, assuming that the state does not intend to move Plaintiff back to the jail. At the same time, if this R&R is adopted by the presiding district judge, the Court is likely to appoint counsel for Plaintiff prior to trial on the remaining claims. In order to allow prospective counsel to be heard on the issue of whether the claims for injunctive and/or declaratory relief are fully moot, the undersigned recommends denying this portion of Defendants' motion without prejudice to renew.

### V. Plaintiff's Motion to Strike and Motion for Summary Judgment

Plaintiff has filed a motion to strike Defendants' motion for summary judgment as well as a counter-motion seeking summary judgment in Plaintiff's favor. The undersigned finds no basis for striking Defendants' motion or for excluding use of the transcript of Plaintiff's deposition.

---

[25]Defendant Akers (alone) is entitled to qualified immunity based upon the lack of any evidence from which a jury could find that he violated any clearly established constitutional right.

Defendants declined to file any response to Plaintiff's motion for summary judgment, citing the motion's untimeliness under this Court's dispositive motion deadline. Even if the undersigned were to fully consider Plaintiff's untimely motion, the undersigned would recommend denial of it for the same reasons that Defendants' motion should be denied. Thus, the existence of multiple genuine issues of material fact preclude the entry of judgment to either party.

## VI.  Plaintiff's Motion to Compel Additional Discovery

Plaintiff filed a motion to compel additional discovery, stating that he has "made several attempts to propound the documents and answers and defendant have only allowed discovery to toll and plaintiff unanswered." (Doc. 54). In opposition to Plaintiff's motion, Defendants argue that Plaintiff has not fully exhausted "all" extrajudicial efforts to resolve the discovery disputes and failed to first seek an informal telephone conference prior to filing his motion.[26] Without elaboration, Defendants further argue that they should not be required to respond to requests to which they have previously responded.

Plaintiff's motion to compel additional discovery will be denied at this time, without prejudice to renew if this Report and Recommendation is adopted.

## VII.  Conclusion and Recommendations

Accordingly, **IT IS RECOMMENDED THAT:**

1. Defendants' motion for summary judgment (Doc. 48) should be **GRANTED in part and DENIED in part**;

---

[26]Local Rule 37.1 states that any party "may" first seek an informal telephone conference. Moreover, due to Plaintiff's current incarceration this request for an informal conference is typically waived.

a.  For the reasons stated, the undersigned concludes that significant issues of material fact preclude granting summary judgment on Plaintiff's Eighth Amendment claims against Defendants Hatfield and Spoljaric and on Plaintiff's First Amendment claim against Spoljaric;

b.  In order to allow prospective counsel to be heard on the issue of whether the claims for injunctive and/or declaratory relief are fully moot, the undersigned also recommends denying Defendants' motion for summary judgment on that claim, but without prejudice to renew;

c.  In all other respects, the Defendants' motion should be granted;

2.  Plaintiff's motion to strike and motion for summary judgment (Docs. 61, 69) should be **DENIED**;

3.  Plaintiff's motion to compel (Doc. 54) should likewise be **DENIED**.


*s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge